DETERMINED IN THE

# FIRST DEPARTMENT,

AT

# GENERAL TERM,

## 𝔍𝔞𝔫𝔲𝔞𝔯𝔶, 1887.

---

## THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT, *v.* EMIL H. BRIE, APPELLANT.

*Forgery — the uttering of a forged certificate of indebtedness purporting to be issued by a State, is included in subdivision 1 of section 33 of 3 Revised Statutes (6th ed.), 944 — such a certificate is not a bill of credit within section 10 of article 1 of the Constitution of the United States — conflict between the mandatory provisions of a statute and a form prescribed by the statute for carrying them into effect — the statute must be construed according to its intent.*

The defendant was convicted in the Court of General Sessions of the crime of uttering a forged certificate, by which the State of Missouri certified that it was indebted to Sanford Tunicliff in the sum of $347.16, on account of services in company B, fifth regiment of the enrolled Missouri militia, but that the certificate was not payable until after the claim of said Sanford Tunicliff for his services had been presented to the United States government and the amount allowed and paid to the State, and then only for the actual amount received from the United States government. Authority to issue such certificates was conferred by a law of the State of Missouri enacted on January 7, 1874.

*Held,* that the certificate was an evidence of debt, or engagement for the payment of money upon a contingency, the forging and uttering of which was made a crime within the meaning of subdivision 1 of section 33 of 3 Revised Statutes (6th ed.), 9 4, under which the indictment was found.

That as these instruments were merely certificates of indebtedness to be paid by the State when the money should be received from the Federal government, and were not designed to be used or circulated in any form as money, but only

to exhibit the obligation incurred by the State to the person named in each certificate, they were not "bills of credit" within the meaning of these words as used in section 10 of article 1 of the Constitution of the United States prohibiting the States from emitting them.

*Craig* v. *Missouri* (4 Pet., 410) followed

The statute of Missouri provided for the auditing and allowance of two classes of claims, one including claims on file in the office of the quartermaster-general, denominated irregular claims, including generally quartermasters' supplies, the other including claims, such as the one in question, of officers and soldiers of the militia for services rendered during the war. The act provided for the allowance of the first class of claims by a commission, of which the quartermaster-general was a member, and directed that they should be certified by the acting quartermaster-general of the State. It authorized the acting paymaster-general to examine such of the latter class of claims as were on file in his office, and provided that when he should find them correct and just that he should allow the same and indorse his allowances thereon, and required a duplicate of each claim allowed to be filed in his office. It then directed that "he shall issue a certificate of State indebtedness for the amount allowed thereon, which certificate shall be signed by the governor and countersigned by the acting paymaster-general, and shall read as follows:" A form of certificate is then given, which at its foot contained on the left side the word "countersigned," followed by a space for the name, which space was followed by the words "acting quartermaster-general of Missouri." At the left lower corner of the certificate in question was the following signature: "J. D. Grafton, Acting Paymaster-General."

*Held,* that as there was a direct conflict between the mandatory provisions of the act and the form prescribed to carry them into effect, the court should construe the act so as to carry into effect the intent of the legislature displayed in it, which required it to construe it so as to require that the officer, whose duty it was made to examine the claim upon which it should be issued, should sign and authenticate the certificate.

That the certificate in question should be held to have been issued in compliance with the act, and was not, upon its face, a void instrument, incapable of being the subject of a forgery. (MACOMBER, J., dissenting)

APPEAL from a judgment of the Court of General Sessions of the county of New York, convicting the defendant of the crime of uttering a forged certificate of indebtedness.

The forged certificate and the statute of the State of Missouri relating thereto are set forth in full in the dissenting opinion of Judge MACOMBER.

*Alexander S. Bacon,* for the appellant.

*De Lancey Nicoll,* for the respondent.

DANIELS, J.:

The certificate, for the uttering of which the defendant was convicted, was dated in August, 1874. It was issued under a law of the State of Missouri, enacted on the seventh of January of the same year, and it obligated the State of Missouri to pay the sum of $347.16, on account of services in company B, Fifth regiment of the enrolled Missouri militia, after the claim of the person therein named, for his services, had been presented to the United States government, and the amount allowed had been by it paid to the State, and then only for the actual amount received from the United States government. This was an evidence of debt or engagement for the payment of money upon a contingency, the forging and uttering of which was made a crime under the statute of this State, upon which the indictment was found. (3 R. S. [6th ed.], 944, § 33, sub. 1.) That the contingency was a remote one, upon which the payment was to be made, did not exclude the certificate from the operation and effect of this statute. It was still an engagement for the payment of money upon a future contingency.

The statute of the State of Missouri, under which it was issued, provided for the auditing and allowance of two classes of claims. The first included claims on file in the office of the quartermaster-general, or which should be there filed, up to the 1st of August, 1874, and were denominated irregular claims, including, generally, quartermaster supplies. The other provisions of the statute included claims of officers and soldiers of the enrolled Missouri militia and the Missouri militia, for services rendered during the war; and the claim for which the certificate set forth in the indictment, and for the uttering of which the defendant was convicted, was of this description. The statute, by its tenth section, authorized and empowered the acting paymaster-general to examine such claims on file in his office, and provided, when he should find them correct and just, that he should allow the same and indorse his allowance on the claims. And, by the thirteenth section of the act, it was further provided that a duplicate of each claim allowed should be filed in the office of the paymaster-general. And it was then directed that " he shall issue a certificate of State indebtedness, for the amount allowed thereon, which certificate shall be signed by the governor and countersigned

by the acting paymaster-general, and shall read as follows." A form of the certificate was then given, which, at its foot, contained, on the left side, the word "countersigned," followed by a space for the name, and that, in completing the line, is further followed by the words "Acting Quartermaster-General of Missouri." As the statute was enacted, therefore, it, in its language, directed the certificate to be issued by the acting paymaster-general, while the form prescribed dispensed with his authentication of the certificate, and provided for that being done by the quartermaster-general. In this manner a direct conflict was created between the mandatory provision of the act and the form prescribed for carrying it into effect; and the question presented on this part of the case is, which was the paramount authority, and its solution depends upon the intent and design of the act as that has been disclosed. And that seems to be consistent only with the construction, that the certificate should be signed and authenticated by the officer whose duty it was made to examine the claim upon which it should be issued. This construction is sustained by the general purposes and objects of the act, for the officers who were to examine, audit and allow the claims provided for, were those in whose offices they were at the time, or should aferwards be filed. Those relating to the quartermaster-general's department were filed, and were directed to be filed, in his office. He was the person who, in the ordinary course of the exercise of his authority, would be best acquainted with the merits of that description of claims, while he could not reasonably be expected to be familiar with the other class, including only the claims of the officers and soldiers in the militia. Those claims appertain to, and were especially within the province of the paymaster-general, and it was to his audit and allowance that they were committed by the act. The act further provided that when the claims subjected to the commission, of which the quartermaster-general was made a member, should be allowed, that they should be certified by a certificate, authenticated in the form consistent with that allowance, by the acting quartermaster-general of the State. He had no duty whatever to perform concerning the claims made for the services rendered by the officers and soldiers of the militia and could not be familiar with them as he would be with the other class of claims. And it could not reasonably be expected that he should certify, as correct claims,

those he was not required to examine or investigate, and of which he could practically have no knowledge. But what the legislature designed by the act was, that the claims of each class should be certified by the officer knowing the fact of the truth of the certificate required to be made. And that intention is further disclosed by the thirteenth section of the act, directing the acting paymaster-general to issue the certificates of State indebtedness for the amounts allowed for the services of the officers and soldiers; and he could not do that without authenticating them as the law intended that to be done. And from that fact, as well as the general scope and tenor of the act, it is quite manifest that, in giving the form of the certificate in the act, to be issued by the acting paymaster-general, a mistake was made in omitting his official designation, and in place of it inserting the word "quartermaster;" and, as this was evidently a mistake, it is required to be rejected, for the intent of the act is clearly to that effect, and that intent is required to be followed in its construction. That has not only been manifested by its general object and purpose, but, in addition to that, by the explicit direction that the paymaster-general should be the officer who, with the governor, should issue the certificate. This certificate must accordingly be held to have been issued in compliance with the authority contained in the act, inasmuch as it was certified by the governor and by the acting paymaster-general. Upon its face, therefore, it was not a void instrument issued under this statute, and accordingly incapable of being the subject of a forgery, within the principle supported by the cases of *Cunningham* v. *People* (4 Hun, 455); *Fadner* v. *People* (2 N. Y. Crim. R., 553; 2 Bish. Crim. Law, § 533); neither was it invalidated by anything contained in section 52 of article 4 of the Constitution of the State of Missouri, adopted in 1875, for that merely prohibited an appropriation of money by the legislature of the State to pay these certificates, until after the claims audited had been presented to and paid by the government of the United States to the State of Missouri. This section of the Constitution leaves the certificates precisely as they were allowed to be made and issued under the act of 1874. The obligation expressed in them, as that was provided for by the act, was in no manner changed or intended to be changed by the Constitution; and, indeed, it could not have been, as the Consti-

tution of the United States restrained the State of Missouri from passing any act impairing the obligation of its contracts; but it left the certificates as they had been issued, creating an obligation against the State to pay over the money whenever it should be received from the government of the United States.

These instruments, being merely certificates of indebtedness to be paid by the State when the money should be received from the Federal government, were not designed to be used or circulated in any form as money, but only to exhibit the obligation incurred by the State to the person named in each certificate; and they were, accordingly, not bills of credit which the State was forbidden to issue by the Federal Constitution. That was held in *Craig* v. *Missouri* (4 Peters, 410, 432), not to include "contracts by which a State binds itself to pay money at a future day for services actually received, or for money borrowed for present use." And, as a certificate of indebtedness, it was capable of being sold and transferred by the person to whom it is stated to have been issued, for evidence of an indebtedness, not restricted in the right to transfer it, may, be assigned by the holder to any other person or persons; and a delivery of the instrument, intending to pass the title to it, is, in judgment of law, equivalent to its formal assignment, giving the assignee the right to demand and receive the money mentioned in it. Upon neither of the grounds which have been considered, nor for any other reason presented by the case, does the conviction appear to have been unwarranted. It was, on the contrary, legal and regular, and the judgment should be affirmed.

BRADY, J.:

I concur with brother Daniels, after full examination and reflection.

MACOMBER, J. (dissenting):

The defendant was convicted in the Court of General Sessions of the Peace in New York, on the 12th of February, 1886, of the crime of uttering a forged certificate under an indictment drawn in pursuance of chapter 1, part 4, article 3, section 32 of the Revised Statutes. The certificate so uttered is as follows:

"No. 2676. $347.16.

"It is hereby certified that the State of Missouri is indebted to Sanford Tunicliff in the sum of three hundred and forty-seven $\frac{16}{100}$ dollars, on account of services in Co. B, 5th Regiment, E. M. M. This certificate is not payable by the State until after the claim of said Sanford Tunicliff for his services has been presented to the United States Government and the amount allowed and paid to the State, and then only for the actual amount received from the United States Government.

"City of Jefferson, Mo., *August* 19, 1874.

"SILAS WOODSON,
"*Governor of Mo.*

"J. D. Grafton,
"*Acting Paymaster Gen'l.*"

The certificate bears on its back the words "S. Tunicliff." No question is raised on this appeal except the question whether the forged certificate, for uttering which the defendant was convicted, is the subject of a forgery. It is claimed by counsel for the appel lant that it is not, because the issuing of it by the State of Missouri was unconstitutional, being prohibited by section 10, article 1 of the Constitution of the United States, which declares that no State shall emit bills of credit. In this contention we think the learned counsel is in error. The certificate is an agreement by the State of Missouri to pay upon a contingency a certain indebtedness which it had incurred arising out of the raid within its borders of General Price during the late war. In the case of *Craig* v. *The State of Missouri* (4 Peters, 410) it was held that the term "bills of credit," as used in the Constitution of the United States in its enlarged, and perhaps in its literal sense, comprehended any instrument by which a State engages to pay money at a future day, and for which, of course, it obtains a present credit, and that thus it would include a certificate given for money borrowed. The court there says that "The language of the Constitution itself, and the mischief to be prevented, which we know from the history of our country, equally limit the interpretation of the terms. The word 'emit' is never employed in describing those contracts by which a State binds itself to pay money at a future day for services actually received,

or for money borrowed for present use. Nor are instruments executed for such purposes in common language denominated bills of credit. ' To emit bills of credit' conveys to the mind the idea of issuing paper intended to circulate through the community for its ordinary purposes as money, which paper is redeemable at a future day. This is the sense in which the terms (of the Constitution) have been always understood." (See opinion of Chief Justice MARSHALL.)

The more serious question in the case is (the requirements of the statute of Missouri in respect to the signatures thereto not being complied with) whether or not the instrument uttered was a forgery at all. By the act of the legislature, approved March 19, 1874, it was provided, among other things, as follows:

" SECTION 10. That for the purpose of settling the claims of officers of the enrolled Missouri militia and Missouri militia, for services rendered during the war, the acting paymaster-general is hereby authorized to examine the claims of all officers and soldiers whose names appear as not paid on the record of unpaid claims on file in his. office, and if he finds such claims correct and just, he shall allow the same and indorse said allowance on said claim, and if not correct he shall indorse such fact on the claim and return the same for correction; provided, however, that whenever a person is reported on the record of unpaid claims as absent without leave, the acting paymaster-general shall not audit and allow said claim until he has presented sufficient proof that he was not absent without leave, or had not deserted."

" SECTION 13. That the duplicate of all claims passed upon by the acting paymaster-general shall be filed in his office; those rejected with the cause of their rejection, and those allowed with the amount allowed thereon, and the originals of all claims, with the indorsement of their allowance or rejection, shall be returned to the party filing the same; and on presentation of the original of any claim allowed as aforesaid to the acting paymaster-general, he shall issue a certificate of State indebtedness for the amount allowed thereon, which certificate shall be signed by the governor and countersigned by the acting paymaster-general, and shall read as follows:

No........                                                $ *.......

It is hereby certified that the State of Missouri is indebted ·to........in the sum of........on account of services in com-. pany........regiment........This certificate is not payable by the State until after the claim of said........for his services has been presented to the United States government, and the amount allowed and paid to the State, and then only for the actual amount received from the United States government.

CITY OF JEFFERSON, MISSOURI,............18....

.....................
*Governor of Missouri.*

Countersigned. ...................
*Acting Quartermaster-General of Mo.*

By inspection of the certificate which was uttered by the defendant, and the form prescribed by the statute already quoted, it will be seen that in the certificate which the defendant uttered, the name of the acting quartermaster-general of Missouri does not appear, but there is placed off to the left of the certificate the name of a person who is called acting paymaster-general. It appears, therefore, that the paymaster-general would, had this certificate been true, have issued a paper purporting to be an indebtedness of the State of Missouri, without having attached thereto the name of one of the persons whose signature was made absolutely indispensable by the very terms of the statute under which a genuine certificate could be issued.

The rule as now thoroughly established in this State is this : If an instrument be invalid on its face, it cannot be the subject of a forgery, and forging any instrument or writing which, as appears on its face, would have been void if genuine, is not an indictable offense. In the case of *Fadner* v. *The People* (2 N. Y. Crim. R., 553), the accused was indicted for forgery in having uttered a false and forged impression of the seal of the Supreme Court with intent to defraud, and it appeared on the trial that no such pretended judgment had ever been granted, and that the alleged copy was a forgery. It was held that as the pretended certificate of the county clerk upon which the seal was impressed was not in the form prescribed by the Code of Civil Procedure, sections 957 and 958, it was void on its face, and that the act specified did not

furnish the basis of an indictment for forgery.    (See Bishop on
Crim. Law, § 538.)

It is apparent upon the reading of the statute and the form of
the certificate that the purpose of the legislature of Missouri was, in
order to secure greater safety to itself, to require at the foot of the
instrument both the signatures of the governor and of the acting
quartermaster-general, and that then and only in such case could it
be permitted to the acting paymaster-general to perfect it by
countersigning and delivering such certificate to the person for whom
it was designed.    An instrument bearing the signature only of the
governor, when the name and signature of the quartermaster-general
is required to be written underneath the governor's, cannot be
deemed to be such an imitation as, in a legal sense, can be said to
be calculated to deceive.    This intrument had no validity at common
law and derives whatever value it possesses solely from the act of
the legislature.    Nor can any strength be given to the case of the
people by reference to the general scope and purpose of the statute
outside the form prescribed for the certificate.    The acting
paymaster-general had devolved upon him by section 10 the duty
of approving or disapproving of the claims presented against the
State.    That duty, however, is far different from any power given
him to issue a completed and negotiable certificate of indebtedness of
the State for such claim.    To the extent of allowing a just claim,
the part required of him by the statute was *quasi* judicial and
wholly independent of other officers of the State.    His affirmative
and favorable action upon an application established an equitable
though contingent liability against the State, but it went no farther.

Whether or not such allowance by him should ripen into a
negotiable certificate for the amount of such demand was made
dependent, under section 13, upon his preparing ("issuing" it is
called in the statute) a certificate for the signature of the governor
and of the acting quartermaster-general, which should thereafter be
countersigned by him, and which, when so signed and countersigned
and delivered, became a valid and negotiable instrument for the
payment of money upon a contingency.    The circumstance that
the name of the acting quartermaster-general is prescribed and
made essential in the form only, and not in the preliminary clause
of the section, is of no moment.    The form required is contained in

and is a part of the same section which permits the issuing of any certificate. It is not inconsistent with the purely inactive portion of that section, but provides an additional safeguard against mistake, fraud or collusion.

The makers, in the common acceptation of the term, of the certificate were the governor and the quartermaster-general. The acting paymaster-general was required to countersign the instrument so signed by the other officers, when, and then only, it became a completed instrument. In the making of the paper itself the part taken by the acting paymaster-general was auxiliary and subordinate to the previous signatures of the governor and of the quartermaster-general. To countersign is to sign what has already been signed by a superior to authenticate a writing. (Webster's Dic.)

The argument, therefore, of the learned assistant district attorney, to the effect that the name of the quartermaster-general in the form was a mere mistake, and not contemplated by the act, lacks cogency, in my judgment, because, first, it confounds the judicial duties of the acting paymaster-general, under section 10, in allowing claims against the State at the outset with his purely clerical duty in countersigning an instrument executed by other officers, which would, through the joint names of the three, become negotiable; and, secondly, because it asks the court to say that a part of one section, and that, too, the concluding portion of a statute, shall be disregarded by us as superfluous and as a mistake when there is no inconsistency or discrepancy between the several parts.

Moreover, in the absence of actual inconsistencies we are not called upon to seek reasons for a peremptory clause of a statute, but if we were, a most excellent one is apparent in the requirement of the name of the quartermaster-general as a maker of the certificate, as an additional guaranty against imposition and fraud. If the defendant had been indicted for the deceit in getting money by a false token, the questions would be essentially different from those herein considered.

For these reasons the conviction should be reversed and the defendant discharged.

Judgment affirmed.